**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

VALERIE C. SCHMITZ, individually and
as Personal Representative of the ESTATE
OF DAVID J. SCHMITZ, deceased,

*Plaintiffs*,

vs.

LOCKHEED MARTIN CORPORATION,
ROCKWELL COLLINS, INC.,
TELEDYNE RISI, INC., d/b/a
TELEDYNE ELECTRONIC SAFETY
PRODUCTS, and TELEDYNE RISI,
INC., d/b/a TELEDYNE ENERGETICS,

*Defendants*.

CASE NO.: 3:22-CV-02419-MGL

**SECOND AMENDED COMPLAINT**

<u>COMPLAINT</u>

The Plaintiff, Valerie C. Schmitz, Individually and as Personal Representative of the

Estate of David J. Schmitz, by counsel, for this cause of action against Defendants Lockheed

Martin (hereinafter "LOCKHEED"); Rockwell Collins, Inc. (hereinafter "COLLINS");

Teledyne Risi, Inc., d/b/a Teledyne Electronic Safety Products and Teledyne Risi, Inc., d/b/a

Teledyne Energetics (hereinafter "RISI"):

1.     The Plaintiff, Valerie C. Schmitz, was the lawful wife of David J. Schmitz and

is the duly appointed Personal Representative of the Estate of the David J. Schmitz by the

Sumter County Probate Court on August 17, 2020.  At the time of the aircraft crash at issue

herein, which took the life of her husband, Plaintiff Valerie C. Schmitz lived with her husband

David J. Schmitz, in Sumter County, South Carolina.

2.     Defendant Lockheed Martin is incorporated under the laws of the state of Maryland, and its principal office is located in Bethesda, Maryland.  Lockheed owns property in and operates in South Carolina, namely a large aircraft manufacturing plant in Greenville, South Carolina, where it manufactures the F-16 aircraft.  This is the type of aircraft involved in this crash.

3.     Defendant Rockwell Collins, Inc. is incorporated under the laws of the state of Delaware, with its principal place of business located in Cedar Rapids, Iowa.  Rockwell Collins manufactures components of aircraft ejection systems including the system which is the subject of this lawsuit.  Defendant does substantial business in this district and manufactured and provided components to the ejection system which is the subject of this lawsuit.

4.     Defendant Teledyne Risi, Inc. is incorporated under the laws of the state of California, with its principal place of business located in Chatsworth, CA. Risi does substantial business in this district and designed, manufactured and provided components to the ejection system which is the subject of this lawsuit.

5.     This Court has original subject matter jurisdiction of this matter pursuant to Article I, § 8, cl. 17 of the U.S. Constitution, as part of this cause of action occurred in a federal enclave, namely Shaw Air Force Base, Sumter, South Carolina.  (*See Willis v. Craig,* (9th Cir. 1977) 555 F2d 724, 726; *Celli v. Shoell* (10th Cir. 1994) 40 F.3d 324, 328).  In the alternative, this Court also has jurisdiction pursuant to 18 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs is between citizens of different states.

6.      Venue is based on 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district, and each Defendant is subject to the personal and/or general jurisdiction in this Court.

7.      This action is brought by the Plaintiff for the death of her husband, First Lieutenant (1st Lt) David J. Schmitz, United States Air Force (USAF), who on June 30, 2020, suffered grievous injuries and ultimately was killed when he ejected from his stricken F-16 "Fighting Falcon" (hereinafter "F-16") fighter jet, but his Advanced Concept Ejection Seat (hereinafter "ACES II") failed to function as designed when its Digital Recovery Sequencer (hereinafter "DRS") malfunctioned, and his ejection seat parachute failed to deploy.

8.      Approximately seven seconds after initiating ejection, 1st Lt David J. Schmitz was injured and thereafter died from his injuries when he slammed into the ground while still strapped into his ejection seat.

9.      1st Lt David J. Schmitz's injuries occurred in the air over Shaw Air Force Base during the ejection sequence and upon impact with the ground and his death occurred in an area adjacent to a taxiway at Shaw Air Force Base (AFB), which is near Sumter, South Carolina.

10.      At the time of his death, 1st Lt David J. Schmitz was on active duty in the USAF and was the sole occupant of his F-16 and was acting as pilot-in-command at the time of the ejection seat malfunction.

11.      At all relevant times alleged herein, 1st Lt David J. Schmitz was stationed in the State of State of South Carolina at Shaw AFB.

12.      At all relevant times alleged herein, Plaintiff Valerie C. Schmitz was the wife of 1st Lt David J. Schmitz.

13.     The F-16 "Fighting Falcon" is a single-engine multirole fighter aircraft originally developed by General Dynamics for the USAF.

14.     In 1993, General Dynamics sold its aircraft manufacturing business to LOCKHEED.

15.     The aircraft from which 1st Lt David J. Schmitz ejected was an USAF F-16CM, tail number 94-0043 (hereinafter "ACCIDENT AIRCRAFT"), which was assigned to the 77th Fighter Squadron, 20th Fighter Wing at Shaw AFB in South Carolina.

16.     Defendant LOCKHEED currently designs, manufactures, tests, markets, and sells the F-16 aircraft from manufacturing facilities in the State of South Carolina.

17.     As the manufacturer of F-16 aircraft, Defendant LOCKHEED owes the highest degree of care to all pilots who fly F-16 aircraft to design, manufacture, assemble, integrate, inspect, test, service, repair and modify F-16 aircraft with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury as a result of patent and latent defects posed by improper design, assembly, integration, manufacture, inspection, quality assurance, testing, servicing, repairs, modifications of F-16 aircraft and its component parts.

18.     Defendant LOCKHEED is a Maryland corporation doing business in the State of South Carolina.

19.     Defendant LOCKHEED provides F-16 aircraft parts to United States Air Force (USAF) units at Shaw Air Force Base (AFB) located within Sumter County.

20.     Defendant LOCKHEED provides Contract Instructor Pilots (CIPs) for military pilot training in the state of South Carolina; provides contract maintenance personnel for the maintenance and servicing of military aircraft located in the state of South Carolina; provides

simulators and simulator support for military pilot training in the state of South Carolina; and owns property in the state of South Carolina.

21.    Defendant LOCKHEED is registered with the South Carolina Secretary of State and maintains a registered agent in the State of South Carolina.

22.    Defendant COLLINS designed, manufactured, tested, marketed, and sold the ACES II ejection seat system.

23.    As the manufacturer of the ACES II ejection seat, Defendant COLLINS owes the highest degree of care to all pilots who fly in the ACES II ejection seat, and to design, manufacture, assemble, integrate, inspect, test, service, repair and modify ACES II ejection seats with the highest degree of care to exercise the highest degree of care to prevent injury of any kind, including injury as a result of patent and latent defects posed by improper design, assembly, integration, manufacture, inspection, quality assurance, testing, servicing, repairs, modifications of the ACES II ejection seat or its component parts.

24.    COLLINS (also sometimes known as and referred to as Rockwell Collins) is registered with the South Carolina Secretary of State and maintains a registered agent in the State of South Carolina.

25.    Defendant RISI designed, manufactured, tested, marketed, and sold the Digital Recovery Sequencer (DRS).

26.    As the manufacturer of the DRS, Defendant RISI owe the highest degree of care to all pilots who fly in the ACES II ejection seat to design, manufacture, assemble, integrate, inspect, test, service, repair and modify DRS units with the highest degree of care, and to exercise the highest degree of care to prevent injury of any kind, including injury as a result of patent and latent defects posed by improper design, assembly, integration,

manufacture, inspection, quality assurance, testing, servicing, repairs, modifications of the DRS and its component parts.

27.    During a normal ACES II ejection sequence, the DRS controls the sequential firing of cartridge actuated devices (CAD) responsible for providing ejection seat stabilization, pilot and ejection seat separation, and parachute deployment.

28.    The USAF determined the DRS in 1st Lt David J. Schmitz's ejection seat malfunctioned, which caused him to remain strapped in his ejection seat without a parachute, and consequently, slam into the ground.

29.    The USAF set the DRS's system reliability requirement at 0.999%; however, according to an open-source undated PowerPoint presentation (estimated to be produced by the USAF in the Spring of 2017) the Program Manager for the Munitions Sustainment Division at Hill AFB, Utah, which is the Division responsible for management of the ACES II ejection seat, wrote that historical data showed DRS units had an observed failure rate of 0.056%.

30.    To improve the reliability of the DRS, and reduce the failure rate, the USAF approved Time Compliance Technical Order (TCTO) 11P2-3-502, *Installation of Shorting Plug on DRS Electronic Module*.

31.    TCTO 11P2-3-502 modified the wire connections between the ACES II ejection seat and the DRS which was a modification designed to prevent noise bias issues that had been observed in channel #3 of the DRS's 3-channel system.

32.    LOCKHEED employs an "F-16 Escape & Life Support Product Lead" who coordinates with COLLINS and/or RISI and serves as LOCKHEED's subject matter expert regarding the ACES II ejection seat installed in the F-16.

6

33.    LOCKHEED employs an "F-16 Flight Manual Manager" who is responsible for documenting and illustrating ACES II ejection seat components and describing the ACES II ejection seat function and operation in the F-16 pilot flight manual.

34.    Upon information or belief, LOCKHEED, COLLINS and RISI were involved in developing TCTO 11P2-3-502, and were involved in the design and modification of the wire connections between the ACES II ejection seat and the DRS.

35.    Upon information or belief, LOCKHEED, COLLINS and RISI were aware, or should have been aware of the unreliability of DRS units prior to 1st Lt David J. Schmitz's ejection and subsequent death.

36.    The TCTO 11P2-3-502 kits used by the USAF were provided at no cost to the U.S. Government.

37.    Upon information or belief, the TCTO 11P2-3-502 kits were provided at no cost to the U.S. Government because LOCKHEED, COLLINS and RISI acknowledged the DRS's original design did not meet U.S. Government or USAF contract specifications.

38.    1st Lt David J. Schmitz's ejection seat did not have TCTO 11P2-3-502 incorporated at the time of his ejection.

39.    In 2012, the USAF Safety Center recommended that the DRS be replaced with a more reliable component.

40.    Due to administrative/legal delays concerning Government Use data rights and late acquisition of parts from sub-tier suppliers, a replacement for the DRS was delayed, and the USAF was forced to extend the service life of DRS units already installed in ejection seats.

41.    Due to concerns about the reliability of DRS units already installed in the ACES II ejection seats with and without TCTO 11P2-3-502 incorporated, the USAF

conducted "quality evaluation testing" in December 2017 on 30 DRS units that had exceeded their 10-year service life and conducted further testing on 30 additional DRS units in August of 2018.

42.     RISI designed, manufactured, and supplied to the USAF a "portable functional test set", which was used to conduct the "quality evaluation testing" of the DRS units in December 2017 and August 2018.

43.     Upon information or belief, LOCKHEED and/or RISI, and/or COLLINS collectively or independently conducted the DRS "quality evaluation testing" or provided personnel to assist or advise the USAF during the DRS "quality evaluation testing" in December 2017 and August 2018.

44.     Quality evaluation testing of the 60 DRS in 2017 and 2018 discovered that 3 of the 60 DRS units had abnormalities.

45.     The 3 DRS units with abnormalities were sent to RISI for further evaluation and testing.

46.     After further evaluation and testing, RISI indicated that of the 3 DRS units that had abnormalities, 2 units would have functioned normally during an ejection.

47.     Although approximately two years had elapsed between RISI's 2018 evaluation/testing and 1st Lt David J. Schmitz's June 2020 ejection, at the time of 1st Lt David J. Schmitz ejection, RISI had not issued a determination regarding the 3rd DRS unit.

48.     Upon information or belief, LOCKHEED, COLLINS and RISI withheld information related to the 3rd DRS because had the data been released it would have served to reduce the overall reliability of the DRS required by the U.S. Government and the USAF in its specifications, standards and contracts.

49.     The USAF relied on the data collected during the 2017 and 2018 quality evaluation testing of the DRS units when the USAF decided to extend the service life of the DRS installed in 1st Lt David J. Schmitz's ejection seat.

50.     The USAF relied on the data collected during RISI's evaluation and testing of the abnormal 3 DRS units when the USAF decided to extend the service life of the DRS installed in 1st Lt David J. Schmitz's ejection seat.

51.     Research from the USAF's 2020 Aircraft Accident Investigation Board (AIB), which investigated 1st Lt David J. Schmitz's ejection seat malfunction and subsequent death, found that malfunctioning DRS units had been observed in approximately 9% of all actual aircraft ejections and ground sled testing.

52.      The USAF AIB's discovered 9% DRS failure rate is significantly greater than what was observed during the 2017 and 2018 DRS quality evaluation testing.

53.     As of June 13, 2022, RISI's website still indicated the DRS has a "system reliability" of >.999 (http://teledynesafetyproducts.com/products/drc.asp).

54.     After 1st Lt David J. Schmitz's death, the USAF Research Laboratory determined his malfunctioning DRS contained six suspected counterfeit Metal-Oxide-Semiconductor Field-Effect Transistors (MOSFET), three suspected counterfeit serial flash memory chips, and a suspected counterfeit parallel flash memory chip.

55.     After 1st Lt David J. Schmitz ejection and death, the DRS in his ejection seat was sent to RISI for further in-depth analysis and download of internal memory.

56.     The accident DRS was Part Number 10002109-503, Serial Number 2538.

57.     When the Air Force Research Laboratory (AFRL) received the accident DRS for its independent inspection, AFRL discovered RISI had removed the printed wiring board (PWB) from the DRS housing and had mounted the PWB to a "test fixture".

58.     AFRL did not receive the accident DRS housing from RISI.

59.     AFRL discovered that RISI had removed and replaced 3 serial flash memory chips on the accident DRS PWB.

60.     AFRL discovered that RISI had removed and replaced Channel #2's parallel flash memory chip on the accident DRS PWB.

61.     AFRL discovered that RISI had cut the leads on Channel #2's parallel flash memory chip to facilitate chip removal from the accident DRS.

62.     AFRL discovered that RISI had removed and replaced the X-Y Accelerometer chip on the accident DRS PWB.

63.     AFRL noted that both the original accident X-Y Accelerometer chip and the replacement X-Y Accelerometer chip were suspected of being counterfeit.

64.     AFRL discovered that six MOSFETs on the accident DRS PWB had no conformal coating, were heavily gouged, had arcing scratch marks, were considered obsolete, and were suspected of being counterfeit.

65.     AFRL discovered that a capacitor was partially dislodged from its solder pads and hypothesized that it was damaged during the removal or installation of the PWB.

66.     Upon information or belief, by removing and replacing three serial flash memory chips, a parallel flash memory chip, and a dual axis accelerometer chip on the accident DRS PWB, RISI's actions constituted Spoliation.

67.     Upon information or belief, by damaging the leads on the parallel flash memory chip during removal from the PWB, RISI's actions constituted Spoliation.

68.     Upon information or belief, by dislodging and damaging the C262 capacitor during removal or installation from the PWB, RISI's actions constituted Spoliation.

69.     The USAF Research Laboratory determined that counterfeit parts may have contributed to 1st Lt David J. Schmitz's DRS malfunction.

70.     Upon information or belief, LOCKHEED, COLLINS and RISI were aware, or should have been aware DRS units contained counterfeit parts.

71.     The USAF determined that after 1st Lt David J. Schmitz initiated his ejection, he was propelled approximately 130 feet into the air, and a full 6.5 – 7.0 seconds elapsed before he slammed into the ground.

72.     After initiating ejection from his stricken F-16, 1st Lt David J. Schmitz suffered pre-impact physical injury, physical pain and suffering, fright, terror, and mental and emotional pain and suffering prior to impact with the ground.

73.     1st Lt David J. Schmitz is survived by his wife, Valerie C. Schmitz.

74.     None of the aforesaid damages and injuries would have been sustained by the Plaintiff and her deceased husband including prior to his death but for the acts and omissions of the Defendants.

75.     The acts and omissions complained of herein occurred in the County of Sumter, State of South Carolina.

76.     South Carolina Code §15-73-10, among others, applies to this action for claims concerning defective products, manufacturing defects, and marketing defects.  The product defects were the direct and proximate legal and factual causes of the injuries sustained.  The Plaintiff and the Plaintiff's Decedent did not discover the defects and were unaware of the dangers.

**COUNT I**
**STRICT LIABILITY**
**(LOCKHEED)**

77.     Plaintiffs incorporate by reference all other paragraphs of the Complaint as though set forth herein.

78.     At all relevant times herein, LOCKHEED was the designer, manufacturer, certificate holder, distributor, seller, modifier, contractor, subcontractors, installers and/or marketers of the F-16 aircraft, the ACES II ejection seat, the DRS, and the other components and parts at issue herein.

79.     At the time of the crash, the F-16 aircraft, ACES II seat, DRS, and other parts and components, were in substantially the same condition as when they left Defendants' possession.

80.     The F-16 aircraft, ACES II seat, DRS, and other parts and components, replacement parts, and modifications in question were in a defective condition at the time they left the control of the Defendants.

81.     At all times relevant, the operators used the F-16 aircraft, ACES II seat, DRS and all other parts and components, in a way that was reasonably foreseeable to Defendants, and the Defendants' maintenance, modifications, design and re-engineering and replacement of the seat parts and components were substantial factors in causing the failure of the ejection seat, DRS and other parts and components, and the injuries and death of Decedent, and damages to Plaintiff.

82.     At all times relevant, the F-16 aircraft, ACES II seat, DRS and other parts and components were unreasonably dangerous due to the design and execution of the aircraft, seat, DRS, modifications and other aircraft and seat component parts and modifications.

83.     By virtue of the defects and condition of the F-16 aircraft, ACES II seat, DRS, parts and components, the risks associated with the design and execution of the modification of the F-16 aircraft, ACES II ejection seat, DRS, and other aircraft and seat component parts

outweighed the benefits due to the likelihood that harm would occur and the existence of alternative and safer designs that were available.

84.    As designed, manufactured, modified, distributed and sold, the F-16 aircraft, ACES II ejection seat, DRS, and other parts and components were dangerous and defective in that they did not perform as expected or required, and did not perform as safely as the user of the products would have expected on the day of the crash.

85.    The failure of the F-16 aircraft, ACES II seat, DRS and other parts and components to perform safely was a substantial factor in causing the harm to Plaintiff and Plaintiff's Decedent.

86.    The lack of warnings and instruction were substantial factors in causing the crash and the resulting harm to Plaintiff and Plaintiff's Decedent.

87.    The crashing F-16 aircraft, ACES II seat, DRS and other parts and components, were dangerous and defective in that the products lacked sufficient warning and instructions for safe use.

88.    Defendants designed, manufactured, modified, distributed and sold the F-16 aircraft, ACES II seat, DRS and other aircraft components and parts with the risks described herein, which were known or knowable by the Defendants and were within the realm of scientific knowledge distribution and sale of the F-16 aircraft, ejection seat, DRS, modifications, parts and components.

89.    The risks associated with the plane, seat, parts and components presented a substantial danger to the users, including Plaintiff's Decedent.

90.    Ordinary consumers and users of the product, including Plaintiff and Plaintiff's Decedent, would not have recognized, and did not know the potential risks that the ejection

seat would fail, and that the DRS would fail to operate or that the component parts would fail and/or were counterfeit.

91.    LOCKHEED failed to warn and instruct users of the risks associated with their products.

92.    At the time the aircraft, ejection seat, components, and parts left the control of the LOCKHEED, a safer alternative design of the product was available and would have prevented or significantly reduced the risk of personal injury or death without substantially impairing the utility of the aircraft, ejection seat and other components and parts.  This safer alternative design was both economically and technologically feasible by the application of existing scientific knowledge.

93.    As a direct and proximate result of Defendants' conduct, Plaintiff's Decedent was injured and killed and Plaintiff was harmed and suffered the damages set forth herein.

**COUNT II**
**STRICT LIABILITY**
**(COLLINS)**

94.    Plaintiffs incorporate by reference paragraphs 1-76 of the Complaint as though set forth herein.

95.    At all relevant times herein, COLLINS was the designer, manufacturer, certificate holder, distributor, seller, modifier, contractor, subcontractors, installers and/or marketers of the ACES II ejection seat, the DRS, and the other components and parts at issue herein.

96.    At the time of the crash, the ACES II ejection seat, DRS, and other parts and components, were in substantially the same condition as when they left Defendants' possession.

14

97.    The ACES II ejection seat, DRS, and other parts and components, replacement parts, and modifications in question were in a defective condition at the time they left the control of the Defendants.

98.    At all times relevant, the operators used the ACES II ejection seat, DRS and all other parts and components, in a way that was reasonably foreseeable to COLLINS, and COLLINS maintenance, modifications, design and re-engineering and replacement of the seat parts and components were substantial factors in causing the failure of the ejection seat, DRS and other parts and components, and the injuries and death of Decedent, and damages to Plaintiff.

99.    At all times relevant, the ACES II ejection seat, DRS and other parts and components were unreasonably dangerous due to the design and execution of the aircraft, seat, DRS, modifications and other aircraft and seat component parts and modifications.

100.    By virtue of the defects and condition of the ACES II ejection seat, DRS, parts and components, the risks associated with the design and execution of the modification of the ACES II ejection seat, DRS, and other aircraft and seat component parts outweighed the benefits due to the likelihood that harm would occur and the existence of alternative and safer designs that were available.

101.    As designed, manufactured, modified, distributed and sold, the ACES II ejection seat, DRS, and other parts and components were dangerous and defective in that they did not perform as expected or required, and did not perform as safely as the user of the products would have expected on the day of the crash.

102.    The failure of the ACES II ejection seat, DRS and other parts and components to perform safely was a substantial factor in causing the harm to Plaintiff and Plaintiff's Decedent.

103.    The lack of warnings and instruction were substantial factors in causing the crash and the resulting harm to Plaintiff and Plaintiff's Decedent.

104.    The ACES II ejection seat, DRS and other parts and components, were dangerous and defective in that the products lacked sufficient warning and instructions for safe use.

105.    COLLINS designed, manufactured, modified, distributed and sold the ACES II ejection seat, DRS and other aircraft components and parts with the risks described herein, which were known or knowable by COLLINS and were within the realm of scientific knowledge of the ACES II ejection seat, DRS, modifications, parts and components.

106.    The risks associated with the ACES II ejection seat, DRS, parts and components presented a substantial danger to the users, including Plaintiff's Decedent.

107.    Ordinary consumers and users of the product, including Plaintiff and Plaintiff's Decedent, would not have recognized, and did not know the potential risks that the ejection seat would fail, and that the DRS would fail to operate or that the component parts would fail and/or were counterfeit.

108.    COLLINS failed to warn and instruct users of the risks associated with their products.

109.    At the time the ACES II ejection seat, components, and parts left the control of COLLINS, a safer alternative design of the product was available and would have prevented or significantly reduced the risk of personal injury or death without substantially impairing the utility of the aircraft, ejection seat and other components and parts.  This safer alternative design was both economically and technologically feasible by the application of existing scientific knowledge.

16

110.    As a direct and proximate result of COLLINS' conduct, Plaintiff's Decedent was injured and killed and Plaintiff was harmed and suffered the damages set forth herein.

**COUNT III**
**STRICT LIABILITY**
**(RISI)**

111.    Plaintiffs incorporate by reference paragraphs 1-76 of the Complaint as though set forth herein.

112.    At all relevant times herein, RISI was the designer, manufacturer, certificate holder, distributor, seller, modifier, contractor, subcontractors, installers and/or marketers of the DRS and the other components and parts at issue herein.

113.    At the time of the crash, the DRS, and other parts and components, were in substantially the same condition as when they left Defendants' possession.

114.    The DRS, and other parts and components, replacement parts, and modifications in question were in a defective condition at the time they left the control of RISI.

115.    At all times relevant, the operators used the ACES II ejection seat, DRS and all other parts and components, in a way that was reasonably foreseeable to RISI, and RISI maintenance, modifications, design and re-engineering and replacement of the seat parts and components were substantial factors in causing the failure of the ejection seat, DRS and other parts and components, and the injuries and death of Decedent, and damages to Plaintiff.

116.    At all times relevant, the DRS and other parts and components were unreasonably dangerous due to the design and execution of the DRS, modifications and other seat component parts and modifications.

117.    By virtue of the defects and condition of the DRS, parts and components, the risks associated with the design and execution of the modification of the DRS, and other

aircraft and seat component parts outweighed the benefits due to the likelihood that harm would occur and the existence of alternative and safer designs that were available.

118.    As designed, manufactured, modified, distributed, and sold, the DRS, and other parts and components were dangerous and defective in that they did not perform as expected or required, and did not perform as safely as the user of the products would have expected on the day of the crash.

119.    The failure of the DRS and other parts and components to perform safely was a substantial factor in causing the harm to Plaintiff and Plaintiff's Decedent.

120.    The lack of warnings and instruction were substantial factors in causing the crash and the resulting harm to Plaintiff and Plaintiff's Decedent.

121.    The DRS and other parts and components were dangerous and defective in that the products lacked sufficient warning and instructions for safe use.

122.    RISI designed, manufactured, modified, distributed and sold the DRS and other aircraft components and parts with the risks described herein, which were known or knowable by RISI and were within the realm of scientific knowledge of the ACES II ejection seat, DRS, modifications, parts and components.

123.    The risks associated with the ACES II ejection seat, DRS, parts and components presented a substantial danger to the users, including Plaintiff's Decedent.

124.    Ordinary consumers and users of the product, including Plaintiff and Plaintiff's Decedent, would not have recognized, and did not know the potential risks that the ejection seat would fail, and that the DRS would fail to operate or that the component parts would fail and/or were counterfeit.

125.    RISI failed to warn and instruct users of the risks associated with their products.

126.    At the time the ACES II ejection seat, DRS, components, and parts left the control of RISI, a safer alternative design of the product was available and would have prevented or significantly reduced the risk of personal injury or death without substantially impairing the utility of the aircraft, ejection seat and other components and parts.  This safer alternative design was both economically and technologically feasible by the application of existing scientific knowledge.

127.    As a direct and proximate result of RISI conduct, Plaintiff's Decedent was injured and killed and Plaintiff was harmed and suffered the damages set forth herein.

## COUNT IV
## MISREPRESENTATION/BREACH OF WARRANTIES

128.    Plaintiffs incorporate by reference paragraphs 1-76 of the Complaint as though fully set forth herein.

129.    LOCKHEED expressly and impliedly represented the aircraft, ejection seat, DRS and other parts and components as safe and airworthy.

130.    COLLINS expressly and impliedly represented the ejection seat, DRS and other parts and components as safe and airworthy.

131.    RISI expressly and impliedly represented the ejection seat, DRS and other parts and components as safe and airworthy.

132.    Defendants expressly and impliedly represented that the aircraft, ejection seat, DRS, and other components and parts as were assembled in a good and workmanlike manner and that they were fit and safe for the purpose for which same was intended, and that they were not counterfeit.

133.    Defendants failed to disclose to Plaintiff's Decedent that the aircraft's ejection seat, DRS and other components and parts were deficient, counterfeit, defective, unapproved, and otherwise defective, and that the ejection seat would fail to operate when needed and thus its component parts were defective, counterfeit, and otherwise improper.

134.    At all times relevant herein, Defendants held themselves out to purchasers and consumers of the aircraft ejection seat, DRS and parts and components that the aircraft seat and component parts were fit and safe, and made representations about the aircraft and ejection seat regarding performance and failure rates, and suitability for their intended purposes.

135.    In the condition in which the aircraft, seat and parts were delivered to the owners and operators, the aircraft and seat were not suitable for their intended purpose and the Defendants knew or had reason to know of the intended use of the aircraft and ejection seat for a particular purpose.

136.    At the time of purchase of the aircraft, ejection seat, parts, components and modifications, Defendants knew or had reason to know that owners and operators, including Plaintiff's Decedent, would rely on Defendants' skill and judgment to select a product that was suitable for a particular purpose.

137.    Plaintiff's Decedent justifiably relied on Defendants' skill and judgment in making the decision to design, modify, and supply the aircraft ejection seat, parts, components and modifications.  With its inherent design, parts and modification defects and lack of adequate warnings and instructions, the product was not suitable for a particular purpose.

138.    As a result of the unsuitability of the product and its failure to meet the intended purpose, Plaintiff's Decedent was harmed, injured and died.  Plaintiff was damaged as a result of Defendants' failure to provide a product suitable for the particular purpose.

139.    Defendants expressly represented that the aircraft, ejection seat, parts and components were safe and airworthy, when in fact they were not.

140.    Defendants made assurances that the aircraft, ejection seat, parts and components were safe as designed, modified and manufactured, and work was performed to the highest quality and highest standards.

141.    Defendants' failure to deliver the product as expressly and impliedly represented was a substantial factor in causing the injury and death of Decedent, and the harm to Plaintiff and Plaintiff's Decedent.

142.    Defendants breached their implied warranty of merchantability and fitness of purpose by failing to meet acceptable industry and manufacturing standards in the design, construction, and marketing of said aircraft, ejection seat, DRS, parts and components.

143.    As a direct and proximate result of Defendants' conduct, Plaintiff's Decedent was injured and killed and Plaintiff was harmed and suffered the damages set forth herein.

**COUNT V**
**FAILURE TO WARN**

144.    Plaintiffs incorporate by reference all paragraphs 1-76 of the Complaint as though fully set forth herein.

145.    At all relevant times, Defendants negligently failed to warn the public, the maintainers, the pilots, the users, and other intended users and consumers of the F-16, ACES II ejection seat, DRS, and its components and parts were defective, counterfeit, substandard, and could fail without warning.

146.    At all relevant times, Defendants had knowledge that the subject F-16, ejection seat and DRS, parts, components, manuals, and instructions were defective, dangerous, unsafe, and not airworthy and Defendants had knowledge of these unreasonably unsafe conditions, as well as the magnitude of risk for serious bodily injury and death due to these conditions, and Decedent did not know of or recognize the hidden dangerous and defective conditions.

147.    Ordinary consumers, including the public, aircraft maintenance personnel, pilots, owners and Decedent herein would not have recognized the potential risks presented by this F-16, ejection seat, DRS, parts, components, manuals and instructions and their unreasonably dangerous and defective conditions.

148.    Defendants' defects in the design and lack of warnings of the subject ejection seat, DRS, parts, components, manuals and instructions caused the subject accident, which directly, proximately and foreseeably caused the injury, fear of impending and imminent death, conscious suffering, physical injury, pain, and ultimate death of Decedent and injuries and damages to Plaintiff.

149.    As a direct and proximate result of Defendants' conduct, Plaintiff's Decedent was injured and killed and Plaintiff was harmed and suffered the damages set forth herein.

**COUNT VI**
**Death by Wrongful Act, S.C. Code §15-51-10 by LOCKHEED**

150.    Paragraphs 1-93 and paragraphs 129-149 of this Complaint are incorporated as if re-alleged herein.

151.    This cause of action is brought pursuant to Death by Wrongful Act, S.C. Code Section 15-51-10 and the South Carolina Survival Act, S.C. Code Section 15-5-90.

152.    At all times relevant to this action Defendants' agents and employees' acts and omissions occurred within the course and scope of their employment with said Defendants.

153.    Upon information and belief, LOCKHEED served as the "prime contractor" to the U.S. Government for all contractual matters related to designing, manufacturing, testing, marketing, and selling of F-16 aircraft.

154.    Upon information and belief, by designing, manufacturing, testing, marketing, and selling the F-16 aircraft to the USAF as the prime contractor, LOCKHEED owed a nondiscretionary and nondelegable duty to USAF pilots that fly the F-16, and to the general public, including but not limited to Plaintiff's Decedent, to ensure parts designed, manufactured, supplied, and installed in the F-16 by subcontractors, agents and employees met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

155.    Upon information and belief, LOCKHEED had express contractual and other obligations with the U.S. Government to ensure parts designed, manufactured, supplied, subcontracted, sourced, purchased and/or installed in the F-16 by Defendants and/or their agents, employees, contractors or sub-contractors met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

156.    Upon information and belief, LOCKHEED had a duty to adhere to federal law, statues, regulations, ordinances, standards, bid specifications and contracts and other applicable requirements mandating government contractors ensure all parts designed, manufactured, supplied, and installed by Defendants, or by their agents, employees, contractors, or sub-contractors, met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

157.    Upon information and belief, LOCKHEED had a duty to adhere to quality control and quality assurance standards set forth in its contract with the U.S. Government regarding the manufacturing of the F-16.

158.    Upon information and belief, LOCKHEED had a duty to adhere to industry standards regarding quality control and quality assurance standards to ensure parts designed, manufactured, and installed by Defendants or their agents, employees, contractors, or sub-contractors met specifications and were free of all design defects, manufacturing defects and were not counterfeit.

159.    Upon information and belief, LOCKHEED had a duty to provide to the USAF all data in its possession regarding the unreliability of the ACES II ejection seat installed in the F-16, so that the USAF could make informed decisions about DRS life cycle extensions.

160.    Upon information and belief, LOCKHEED had a duty to inform the USAF that the ACES II ejection seat installed in the F-16 contained counterfeit parts, so that the USAF could make informed decisions about DRS life cycle extensions.

161.    At all times material hereto, LOCKHEED had a duty to warn both the USAF and pilots who flew the F-16 of the installation of counterfeit parts, and of defects in the F-16, ACES II ejection seat, DRS or other components.

162.    Upon information and belief, these duties owed by LOCKHEED flowed to and affected 1st Lt David J. Schmitz as a pilot of an F-16 aircraft.

163.    At the aforesaid date, time and place, the LOCKHEED breached the duty of care owed to the Plaintiff and was negligent, negligent per se, reckless, willful, wonton and grossly negligent in one or more of the following particulars:

     a.    Negligently and recklessly installed a defective ACES II ejection seat in 1st Lt David J. Schmitz's F-16 aircraft;

b.  Negligently and recklessly breached its contractual duties with the U.S. Government by installing defective DRS units in F-16 aircraft;

c.  Negligently and recklessly breached federal laws, statues, regulations, ordinances, standards, bid specifications and contracts and other such requirements related to quality control standards required of government contractors by installing defective DRS units in F-16 aircraft;

d.  Negligently and recklessly breached quality control industry standards by installing defective DRS units in F-16 aircraft;

e.  Negligently and recklessly permitted its agents, contractors and subcontractors to manufacture DRS units with counterfeit parts;

f.  Negligently and recklessly permitted its agents, contractors and subcontractors to install a defective DRS in 1st Lt David J. Schmitz's ejection seat;

g.  Negligently and recklessly produced a defective DRS;

h.  Negligently and recklessly failed to properly inspect the defective DRS and its component parts to ensure it was safe for use;

i.  Negligently and recklessly failed to provide proper technical training of persons assembling, inspecting, repairing and or maintaining the defective DRS and its component parts;

j.  Negligently and recklessly withheld critical information regarding the lack of reliability of the DRS from the USAF;

k.  Negligently and recklessly withheld critical information from the USAF that the DRS contained counterfeit parts;

l.  Negligently and recklessly withheld critical information regarding DRS unreliability from F-16 pilots;

164.  As a direct and proximate result of Defendants' conduct, Plaintiff's Decedent was injured and killed and Plaintiff was harmed and suffered the damages set forth herein.

**COUNT VII**
**Death by Wrongful Act, S.C. Code §15-51-10 by COLLINS**

165.  Paragraphs 1-76, 94-110, and 128-149, of this Complaint are incorporated as if re-alleged herein.

166.    This cause of action is brought pursuant to Death by Wrongful Act, S.C. Code Section15-51-10 and the South Carolina Survival Act, S.C. Code Section 15-5-90.

167.    At all times relevant to this action Defendants' agents, contractors, sub-contractors and employees' acts and omissions occurred within the course and scope of their employment with said Defendants.

168.    Upon information and belief, COLLINS served as the "prime contractor" to LOCKHEED, and/or the U.S. Government, for all contractual matters related to designing, manufacturing, testing, marketing, and selling of the ACES II ejection seat.

169.    Upon information and belief, by designing, manufacturing, testing, marketing, and selling the ACES II ejection seat to LOCKHEED, and/or the U.S. Government, as the prime contractor for the ACES II ejection seat, COLLINS owed a nondiscretionary duty to USAF pilots that fly the F-16, and to the general public, including but not limited to Plaintiff's Decedent, to ensure parts designed, manufactured, supplied, and installed in the ACES II ejection seat by subcontractors, agents and employees met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

170.    Upon information and belief, COLLINS had express contractual and other obligations with LOCKHEED, or the U.S. Government, to ensure parts designed, manufactured, supplied, and installed in the ACES II ejection seat by agents, employees, contractors and sub-contractors met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

171.    Upon information and belief, COLLINS had a duty to adhere to federal law, statues, regulations, ordinances, standards, bid specifications and contracts and other applicable requirements, that require government contractors to ensure parts designed, manufactured, and supplied, and installed by Defendants or by their agents, employees,

contractors or sub-contractors met all contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

172.    Upon information and belief, COLLINS had a duty to adhere to quality control and quality assurance standards set forth in its contract with LOCKHEED, and/or the U.S. Government regarding the ACES II ejection seat.

173.    Upon information and belief, COLLINS had a duty to adhere to industry standards regarding quality control and quality assurance standards to ensure parts designed, manufactured, and installed by COLLINS or its agents, employees, contractors or sub-contractors met specifications and were free of all design defects, manufacturing defects and were not counterfeit.

174.    Upon information and belief, COLLINS had a duty to provide to the USAF all data in its possession regarding the unreliability of the ACES II ejection seat, so that the USAF could make informed decisions about DRS life cycle extensions.

175.    Upon information and belief, COLLINS had a duty to inform the USAF that the ACES II ejection seat contained counterfeit parts, so that the USAF could make informed decisions about DRS life cycle extensions.

176.    At all times material hereto, COLLINS had a duty to warn both the USAF and pilots that flew the F-16 of the installation of counterfeit parts, and of defects in the ACES II ejection seat, DRS or other components.

177.    Upon information and belief, this duty owed by COLLINS flowed to and affected 1st Lt David J. Schmitz as a pilot of an F-16 aircraft.

178.    At the aforesaid date, time, and place, the COLLINS breached the duty of care owed to the Plaintiff and was negligent, negligent per se, reckless, willful, wonton and grossly negligent in one or more of the following particulars:

a.   Negligently and recklessly installed a defective ejection seat in 1st Lt David J. Schmitz's F-16 aircraft;

b.   Negligently and recklessly breached its contractual duties with LOCKHEED, and/or the U.S. Government, by installing defective DRS units in ACES II ejection seats;

c.   Negligently and recklessly breached federal laws, statues, regulations, ordinances, standards, bid specifications, contracts and other applicable requirements related to quality control standards required of government contractors by installing defective DRS units in ACES II ejection seats;

d.   Negligently and recklessly breached quality control industry standards by installing defective DRS units in ACES II ejection seats;

e.   Negligently and recklessly permitted its agents, contractors and subcontractors to manufacture DRS units with counterfeit parts;

f.   Negligently and recklessly permitted its agents, contractors and subcontractors to manufacture defective DRS units;

g.   Negligently and recklessly permitted its agents, contractors and subcontractors to install a defective DRS in 1st Lt David J. Schmitz's ejection seat;

m.   Negligently and recklessly produced a defective DRS;

n.   Negligently and recklessly failed to properly inspect the defective DRS and its component parts to ensure it was safe for use;

o.   Negligently and recklessly failed to properly supervise and audit the contractor assembling and inspecting the defective DRS and its component parts;

p.   Negligently and recklessly failed to provide proper technical training of persons assembling, inspecting, repairing and or maintaining the defective DRS and its component parts;

q.   Negligently and recklessly withheld critical information regarding the lack of reliability of the DRS from the USAF;

r.   Negligently and recklessly withheld critical information from the USAF that the DRS contained counterfeit parts;

s.   Negligently and recklessly withheld critical information regarding DRS unreliability from F-16 pilots;

179.    As a direct and proximate result of Defendants' conduct, Plaintiff's Decedent was injured and killed and Plaintiff was harmed and suffered the damages set forth herein.

**COUNT VIII**
**Death by Wrongful Act, S.C. Code §15-51-10 by RISI**

180.    Paragraphs 1-76, 11-127, and 128-149, are incorporated as if re-alleged herein.

181.    This cause of action is brought pursuant to Death by Wrongful Act, S.C. Code Section 15-51-10 and the South Carolina Survival Act, S.C. Code Section 15-5-90.

182.    At all times relevant to this action Defendants' agents, contractors, sub-contractors and employees' acts and omissions occurred within the course and scope of their employment with said Defendants.

183.    Upon information and belief, RISI served as a "contractor" to LOCKHEED, or COLLINS, and/or the U.S. Government, for all contractual matters related to designing, manufacturing, testing, marketing, and selling of the DRS.

184.    Upon information and belief, by designing, manufacturing, testing, marketing, and selling the DRS to LOCKHEED, or COLLINS, or the U.S. Government, RISI owed a nondiscretionary duty to USAF pilots that fly the F-16, and to the general public, including but not limited to Plaintiff's Decedent, to ensure parts designed, manufactured and installed in the DRS by subcontractors met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

185.    Upon information and belief, RISI had express contractual and other obligations with LOCKHEED, COLLINS, or the U.S. Government, to ensure parts designed, manufactured, and installed in the DRS met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

186.    Upon information and belief, RISI had express contractual and other obligations with LOCKHEED, COLLINS, or the U.S. Government, to ensure parts designed, manufactured, and installed in the DRS by agents, employees, contractors and sub-contractors met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

187.    Upon information and belief, RISI had a duty to adhere to federal law, statues, regulations, ordinances, standards, bid specifications, contracts and other applicable requirements that require government contractors to ensure parts designed, manufactured, and installed by agents, employees, contractors and sub-contractors met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

188.    Upon information and belief, RISI had a duty to adhere to quality control and quality assurance standards set forth in its contract with LOCKHEED, and/or the U.S. Government to ensure parts designed, manufactured, and installed by agents, employees, contractors and sub-contractors met contract specifications and were free of all design defects, manufacturing defects and were not counterfeit.

189.    Upon information and belief, RISI had a duty to adhere to industry standards regarding quality control and quality assurance standards to ensure parts designed, manufactured, and installed by RISI or its agents, employees, contractors and sub-contractors met specifications and were free of all design defects, manufacturing defects and were not counterfeit.

190.    Upon information and belief, RISI had a duty to provide to the USAF all data in its possession regarding the unreliability of the DRS, so that the USAF could make informed decisions about DRS life cycle extensions.

191.    Upon information and belief, RISI had a duty to inform the USAF that its DRS units contained counterfeit parts, so that the USAF could make informed decisions about DRS life cycle extensions.

192.    At all times material hereto, RISI had a duty to warn both the USAF and pilots that flew the F-16 of the installation of counterfeit parts, and of defects in the ACES II ejection seat, DRS or other components.

193.    Upon information and belief, this duty owed by RISI flowed to and affected 1st Lt David J. Schmitz as a pilot of an F-16 aircraft.

194.    At the aforesaid date, time, and place, the RISI breached the duty of care owed to the Plaintiff and was negligent, negligent per se, reckless, willful, wonton and grossly negligent in one or more of the following particulars:

a.    Negligently and recklessly manufactured and permitted the installation of a defective DRS in 1st Lt David J. Schmitz's ACES II ejection seat;

b.    Negligently and recklessly breached its contractual duties with LOCKHEED, COLLINS, and/or the U.S. Government, by manufacturing and permitting the installation of defective DRS units in ACES II ejection seats;

c.    Negligently and recklessly breached federal laws, statues, regulations, ordinances, standards, bid specifications and other requirements related to quality control standards required of government contractors by installing defective DRS units in ACES II ejection seats;

d.    Negligently and recklessly breached industry standards regarding quality control and quality assurance by installing counterfeit parts in DRS units;

e.    Negligently and recklessly permitted its agents, employees, contractors and subcontractors to manufacture counterfeit parts for its DRS units;

f.    Negligently and recklessly permitted its suppliers to provide counterfeit parts for its DRS units;

g.    Negligently and recklessly permitted counterfeit parts to be installed in 1st Lt David J. Schmitz's DRS.

h.    Negligently and recklessly produced a defective DRS;

31

     i.     Negligently and recklessly failed to properly inspect the defective DRS and its component parts to ensure it was safe for use;

     j.     Negligently and recklessly failed to properly supervise persons assembling and inspecting the defective DRS and its component parts;

     k.     Negligently and recklessly failed to provide proper technical training of persons assembling, inspecting, repairing and or maintaining the defective DRS and its component parts;

     l.     Negligently and recklessly withheld critical information regarding the lack of reliability of the DRS from the USAF;

     m.     Negligently and recklessly withheld critical information from the USAF that the DRS contained counterfeit parts;

     n.     Negligently and recklessly withheld critical information regarding DRS unreliability from F-16 pilots;

     o.     Negligently and recklessly caused Spoliation by removing and replacing three serial flash memory chips, a parallel flash memory chip, and a dual axis accelerometer chip on the accident DRS PWB;

     p.     Negligently and recklessly caused Spoliation by damaging the leads on the parallel flash memory chip when it was removed from the PWB.

195.     Any or all of the above-stated acts or omissions of negligence, recklessness, willfulness, wantonness and gross negligence were the direct and proximate cause of the injuries and damages sustained by the Plaintiff's Decedent, and these injuries and damages would not have occurred but for one, some, or all of the above acts and/or omissions by the Defendant.

196.     As a direct and proximate result of one or more of the Defendants' respective negligent, grossly negligent, reckless, wanton, and willful acts and/or omissions as set forth above, Plaintiff's Decedent, suffered injuries, including physical injury and physical pain and anguish, excruciating pain and suffering, mental anguish, terror, knowledge of bodily injury and fear of and knowledge of impending death.

197.    As a direct and proximate result of one or more of the Defendants' respective negligent, grossly negligent, reckless, wanton, and willful acts and/or omissions as set forth above, Plaintiff's Decedent was killed.

198.    As a direct and proximate result of Defendants' conduct, Plaintiff's Decedent and Plaintiff were harmed and suffered the damages set forth herein.

## COUNT IX
### Spousal Damages Pursuant to S.C. Code Annotated §15-75-20

199.    All other paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

200.    Decedent's spouse, Valerie C. Schmitz, suffered injuries and losses separate and apart from those suffered by her husband.

201.    Pursuant to South Carolina Code Annotated §15-75-20, as a widowed spouse Plaintiff has, individually and in her own right, a separate cause of action for her own loss of society, companionship, consortium, services, love, affections, assistance, guidance, help, care, and loss of marital relations, as well as for her personal grief, distress, emotional distress, pain and suffering, physical suffering and illness, financial losses and other losses, and other losses and damages separate and distinct from that of her husband.

202.    Plaintiff's separate injuries and damages were caused by the Defendants, and each of them, and were the proximate result of the negligent, grossly negligent, reckless wanton and willful acts and omissions of Defendants', and each of them.

## COUNT X
### Punitive Damages Under the Noneconomic Damages Award Act of 2005

203.    All other paragraphs of this Complaint are incorporated by reference as though fully set forth herein.

204.    Pursuant to the South Carolina Code of Laws §15-32-200, et seq., Plaintiff is entitled to claim punitive damages.

205.    Defendants' behavior as set forth herein and as discovery in this litigation and other federal criminal and civil investigations will further prove, amounts to willful, wanton, egregious, outrageous and actionable behavior, which was knowingly and intentionally undertaken and is dangerous and deadly.

206.    Pursuant to the statute Plaintiff may not request an amount, and therefore only respectfully requests all punitive amounts allowed by law.

207.    However, in the event the jury shall return a punitive damages verdict in excess of the greater of three times the amount of compensatory damages to each claimant entitled thereto or the sum of five hundred thousand dollars, the Plaintiff requests the court consider, as expressly allowed by statute, whether Defendants' conduct together with the high likelihood of injury resulting from the conduct, was known or approved by Defendants' managing agent director, officer or the person; making policy decisions on behalf of Defendants, or whether Defendants' actions could subject Defendants to conviction of a felony and those actions and course of conduct of Defendants are proximate causes of Plaintiff's damages, and in such case the punitive damages many not exceed the greater of four times the amount of compensatory damages to each claimant or two million dollars per claimant.

208.    As a federal criminal investigation into this accident is ongoing, Plaintiff requests the application of all such punitive provisions.  Should Defendants be convicted of or plead guilty to a felony arising out of the same acts or course of conduct complained of herein and that act or course of conduct is the proximate cause of Plaintiff's damages, pursuant to §15-32-530(c)(2), there shall be no cap on punitive damages and Plaintiff requests

to amend and supplement this Complaint and these claims should Defendants so plead or be convicted so as to recover unlimited punitive damages.

WHEREFORE, Plaintiff demands judgment against all Defendants for all damages, including punitive and/or exemplary damages and prejudgment interest recoverable for the Defendants' conduct, including attorneys' fees and for such other and further relief as this Honorable Court and the jury deem just and appropriate.

## DEMAND FOR JURY TRIAL

The Plaintiff demands a trial by jury of all issues triable as of right.

October 20, 2022

Respectfully submitted,

s/ James R. Brauchle

Mary Schiavo, Esq.
James R. Brauchle, Esq.
Motley Rice LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
TEL. 843-216-9000
FAX:  843-216-9440
mschiavo@motleyrice.com
jbrauchle@motleyrice.com